IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LOUIS HANNA, | : | CIVIL ACTION |
| | : | NO. 19-02273 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| LINCOLN FINANCIAL GROUP, | : | |
| | : | |
| Defendant. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                    November 3, 2020

## I.    Introduction[1]

Louis Hanna brings this action alleging that he is entitled to backpay and benefits, and reinstatement or front pay in lieu thereof after being terminated by Lincoln Financial for allegedly poor performance. Hanna argues that Lincoln's reason is pretextual and that he was fired due to discrimination based on age and/or disability.

The Complaint contains six counts: I) termination in violation of his right to be free from age discrimination under the Age Discrimination in Employment Act (ADEA); II) termination in violation of the Americans with Disabilities Act's (ADA)

---

[1]    The facts set forth herein are either uncontested or, if contested, are viewed in the light most favorable to the non-moving party, which is the Plaintiff (Louis Hanna) in this case.

prohibition against employment discrimination based on
disability and/or perceived disability, and/or in retaliation
for invoking his ADA rights; III) termination in violation of
the New Jersey Law Against Discrimination's (NJLAD) prohibition
against employment discrimination based on age and/or
disability; IV) termination in violation of the Family and
Medical Leave Act's (FMLA) prohibition against retaliation for
requesting FMLA leave; V) breach of contract for failing to pay
Hanna commissions due on one or more recruited advisors under
the Incentive Compensation Plan; and VI) failure to pay Hanna
commissions/expenses due under the New Jersey Wage Payment Law
(NJWPL).

Before the Court is Lincoln's Motion for Summary Judgment.
For the reasons set forth below, the Motion will be denied in
full with respect to Counts II-V, denied in part as to Count I
for the individual disparate treatment ADEA claim, and denied in
part as to Count VI for the NJWPL claim as it relates to unpaid
wages. However, Lincoln's motion will be granted in part with
respect to Count I for the ADEA pattern/practice claim and
granted in part under Count VI for the NJWPL claim related to
unidentified expenses.

Therefore, the following claims survive: 1) ADEA individual
disparate treatment under Count I; 2) Count II; 3) Count III; 4)

Count IV; 5) Count V; and 6) NJWPL violation under Count VI as
it relates to unpaid wages.

## II.  Background

Lincoln Financial Group ("Lincoln") employed Louis Hanna
("Hanna") in 2015 in a dual role of regional recruiter and
internal recruiter team manager. Am. Compl. ¶ 6, ECF No. 6. Much
of Hanna's compensation was in the form of a commission-based
compensation plan. In early 2017, Hanna began to exhibit an
underlying health issue. Consequently, he met with Kelly Pippett
("Pippett"), a Lincoln HR manager, around April or May of 2017
to discuss the possibility of going out on Short-Term
Disability, FMLA, and/or receiving paid time off in case his
health issue required it. Id. ¶¶ 7-8.

Hanna was given his 2017 performance goals in April of that
year. Id. ¶ 9. On June 15, 2017, Hanna received a Formal Written
Warning, which contained a Performance Improvement Plan ("PIP"),
which stated that "By July 15th you must have made significant
progress toward your 2017 sourced goal of $1,600,000 and joint
goal of $2,400,000." Id. ¶ 10. On June 19, Hanna met with
Pippett, and told her that he disagreed with the PIP. Id. ¶ 11.
On June 22, 2017, he wrote a formal rebuttal to the PIP. Id. On
June 29, Hanna's manager, Paul Cardenas ("Cardenas") informed
Hanna via email that Hanna needed to demonstrate "significant

improvement" within thirty days in order to demonstrate that his goal would be achievable "by year end." Id. ¶ 12. In particular, Cardenas noted that "We will not define 'significant improvement' since we will consider realistic promising pipeline statistics in our consideration." Id. Cardenas also acknowledged that Pippett informed Hanna that he was eligible for short-term disability benefits, and gave Hanna further guidance on how to apply for them. Id. ¶ 13.

According to Hanna, after he disclosed his health issues to Cardenas, Cardenas allegedly took the following actions: 1) made inappropriate comments regarding Hanna being unreliable and "playing the victim"; 2) moved Hanna's office from Center City to Cherry Hill effective on July 17, 2017; 3) assigned Hanna to solicit prospective financial advisors from entities that were subject to Lincoln's "no solicit" list; 4) stole and/or diverted leads on potential recruits; 5) failed to give Hanna credit for advisors he recruited; and 6) deleted Hanna's unused vacation time. Id. ¶ 14.

Despite having many potential recruits "in the pipeline" which, if completed, would allegedly more than meet his annual recruiting goal, Hanna was placed on a "final" PIP on August 3, 2017. Id. ¶ 17. On August 9, Hanna applied for a leave of absence under both FMLA and short-term disability. Id. ¶ 18. On September 20, Hanna was advised in writing that his FMLA leave

had been approved for August 10-August 13 and September 10-September 13, and his short-term disability leave had been approved for September 1-September 13. Id. ¶ 19.

On September 21, 2017, Hanna applied for intermittent leave under the FMLA for September 14, 2017, to December 15, 2017, and was approved for this leave in a letter on October 20. Id. ¶¶ 20-21. Cardenas was made aware of this HR approval at that time. Hanna was terminated on October 26, 2017, allegedly for poor performance and failing to improve his performance under the final PIP toward meeting his year-end goal. Id. ¶ 22. However, according to Hanna, he did not receive the notification (by regular mail) of his intermittent FMLA approval until after his termination. Id. ¶ 21.

According to the "Quarterly Pipeline" report (which was the tool by which Lincoln documented "ownership" of the recruits, the status of recruitment, and projected revenue), at the time of his termination, Hanna allegedly had 1) more than enough potential recruits to meet the year-end goals in his PIP, and 2) far more recruits in both number and dollars than any other recruiter. Id. ¶ 25. Two of the advisors whom Hanna successfully recruited, John Kane and Kevin McDermott, started within days of his termination and alone were expected to generate just shy of $3,000,000 in revenue. Id. ¶ 26. Hanna also allegedly recruited two other advisors (Glowka and Low), who registered with Lincoln

in 2017, prior to Hanna's termination, and three other advisors (Katelhon, Burke, and Melanson) who registered with Lincoln shortly after Hanna's termination. Id. ¶¶ 36-38. Hanna was not given credit for any of these recruits. Id.

Hanna was fifty years old when terminated. He was replaced, at least in part, by Elliott Williams, a significantly younger recruiter. Williams was, at that time, also on a PIP. However, Williams was not terminated despite failing to meet his goals, and was instead promoted to Hanna's position. Id. ¶¶ 41-42.

## III. Legal Standard

Summary judgment is appropriate if no genuine dispute as to any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The Court views the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the nonmoving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56).

## IV.  Discussion

### A.   Count I: ADEA violation

#### 1. Disparate Treatment

To establish a prima facie case of age discrimination under the ADEA, a plaintiff must demonstrate: (1) he is a member of the protected class (here, at least forty years old); (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) he was "ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive." Willis v. UPMC Child.'s

7

Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015) (citing Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013)).

Lincoln concedes that Hanna can establish the first three elements of a prima facie case of age discrimination, but argues that Hanna cannot establish the fourth element of demonstrating that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. Lincoln argues Hanna cannot meet the fourth element because Williams is not a similarly situated younger employee and because Hanna was discharged by Cardenas, who was in the same protected class as Hanna (Cardenas was also over forty years old at the time of firing).

Lincoln's argument that the evidence refutes an inference of age discrimination because Hanna was discharged by someone in the same protected class is unpersuasive. The Supreme Court recognized decades ago that it would be inappropriate to presume that people act in a particular way simply because of their membership in a protected class. See Castaneda v. Partida, 430 U.S. 482, 499 (1977) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group."). Making such an assumption constitutes merely a form of stereotyping, without substantive meaning.

Lincoln's argument that Hanna cannot meet the fourth
element because he cannot identify a similarly situated younger
employee treated more favorably merits more consideration. Hanna
was the oldest of five National Recruiters. The others were
Elliott Williams, Todd Price, Blake McCrary, and Michael Doss.
Each had the same goal: a sourced goal of $1,600,000 and a joint
goal of $2,400,000. Lincoln argues that no other national
recruiter had $0 in affiliated GDC who was not terminated.

In order to understand the issue, some background
information is necessary. GDC stands for Gross Dealer Concession
and is the revenue to a brokerage firm when commissioned
securities and insurance salespeople sell a product. The
parties' briefs refer to three separate kinds of GDC: 1)
anticipated GDC, which is the potential recruits' self-reported
anticipated GDC; 2) actual GDC, which is the GDC for the prior
year as confirmed by Lincoln prior to the representative's
engagement; and 3) recruited or affiliated GDC, which is the
actual (confirmed) GDC for representatives who actually started
at Lincoln. GDC is further broken down into sourced and joint
GDC. Sourced GDC is a result of a registered representative
recruited into Lincoln by the direct efforts of a National
Recruiter. Joint GDC is a result of a registered representative
recruited into Lincoln by the direct efforts of a National

Recruiter in partnership with a Regional Director of Advisor Acquisition or Office of Supervisory Jurisdiction.

Lincoln's reliance on affiliated GDC is misplaced. Cardenas advised Hanna in the June 15, 2017, PIP that the decision to terminate him would be based not on affiliated GDC, but rather on his failure to make "significant progress" toward his GDC goals. Shortly thereafter, Cardenas stated in an email on June 29 that he would not define "significant improvement" since "we will consider realistic promising pipeline statistics in our consideration." Am. Compl. ¶ 12, ECF No. 6.

By that standard, with the exception of Doss,[2] Hanna was expected to perform on par with the other individuals who were not ultimately terminated, as explained further below. When Hanna was put on final warning on August 3, 2017, Williams, Price, and McCrary were at less than half of their year-end goals, yet none were ever terminated along with Hanna. Furthermore, Hanna's territory was then reassigned to Williams, who was then twenty-eight years old. Thus, Hanna has plausibly alleged he was replaced by a similarly situated younger employee who was treated more favorably than him. This evidence combined

---

[2]    The fact that Doss was terminated has little bearing on Plaintiff's ability to prove his prima facie case. First, Doss is not a "comparator" for establishing the prima facie case – i.e., a similarly-situated person outside the protected class who was treated more favorably. Second, Lincoln has not demonstrated what Doss's pipeline looked like, and whether he was making "significant improvement" toward meeting his goal as demonstrated by "promising pipeline statistics."

is sufficient to give rise to an inference of discrimination. Under these circumstances, Hanna has stated a prima facie case of age discrimination.

Having satisfied his prima facie case, "the burden of production shifts to the employer to identify a legitimate non-discriminatory reason for the adverse employment action." Smith v. City of Allentown, 589 F.3d 684, 690 (3d Cir. 2009) (citing Keller v. Orix Credit All., Inc., 130 F.3d 1101, 1108 (3d Cir. 1997)). "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). "If the employer makes that showing, the burden of production shifts once again to the employee to establish that the employer's proffered justification for the adverse action is pretextual." Smith, 589 F.3d at 691 (citing Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 254-55 (1981)). However, the burden of persuasion remains at all times with the employee. See Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 193 (3d Cir. 2015) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)).

To demonstrate pretext, a plaintiff must provide evidence from which a factfinder could reasonably "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that

11

an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764.

Lincoln argues that its legitimate non-discriminatory reason is that it terminated Plaintiff's employment because of his unsatisfactory sales performance[3] and only after he received multiple written warnings regarding his need for immediate improvement. This satisfies Lincoln's burden of production.

As to the ultimate burden of persuasion, Hanna argues that this reason is pretextual because the warnings contained three separate objectives, two of which were objective (and which Lincoln concedes that Hanna achieved), and one of which was concededly subjective – making "significant progress" based on "realistic pipeline statistics" toward his GDC goals. Hanna's HR Manager (Pippett) and one of his supervisors (Heather Wills) conceded during deposition that such a standard is different from affiliated GDC and that "significant progress" does not mean having an actual affiliation. See Pippett Dep. 90:1-6, ECF No. 20-4; Wills Dep. 75:4-11, ECF No. 20-4.

---

[3]     Lincoln again cites the $0 in affiliated GDC as a benchmark, but later admits in their motion that this was a mistake and that Hanna had approximately $390,000 of affiliated GDC at the time of his termination. It is not clear where this number is coming from and Lincoln seems to be confused about what the true number was. Hanna alleges he only had $326,165 of affiliated GDC at the time of termination, but that the correct number to consider is $1,859,321 if we are using the standard set forth by Cardenas.

The Third Circuit has recognized that reliance on subjective criteria can be, under certain circumstances, a mask for discrimination. See Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 320 (3d Cir. 2000) ("Subjective evaluations are more susceptible of abuse and more likely to mask pretext." (quoting Weldon v. Kraft, Inc., 896 F.2d 793, 798 (3d Cir. 1990))); Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006) ("[L]ow evaluation scores may be a pretext for discrimination, especially where, as here, an employer uses subjective criteria . . . to rate its employees.").

The fact that the use of subjective criteria can, under certain circumstances, cloak the real motive(s) of an employer is relevant in this case. Lincoln points out that at the time of Hanna's termination, there was internal doubt surrounding Hanna's role in recruiting Kane and McDermott. Lincoln argues that even if Hanna could take credit for getting them in the pipeline, their affiliations would have had zero impact on Hanna's sourced goal (which was allegedly the primary measurement of a National Recruiter's success) given the fact that a Third-Party Recruiter was utilized in the recruitment process. This argument is doubtful for several reasons.

First, Cardenas and Wills admitted in their depositions that but for his termination, Hanna would have gotten credit for Kane and McDermott. Cardenas Dep. 98:18-21, ECF No. 20-4; Wills

Dep. 111:17-112:22, 124:18-23, ECF No. 20-4. Second, the first
tangible hint of any contention that Hanna would not be
recognized for his efforts in recruiting Kane and McDermott came
on November 20, well after Hanna's termination on October 26,
and a week after Lincoln received a litigation hold letter
referencing Hanna's potential claims.[4] And yet, Kane and
McDermott appeared on Hanna's proposed compensation statement as
late as January 2018 – and then the references to Kane and
McDermott were inexplicably removed. A reasonable jury could
conclude that the compensation statements were purposely changed
to undermine Hanna's claims regarding his role in the
Kane/McDermott recruiting process.

Lincoln's argument that the Kane/McDermott affiliations
would have had zero impact on Hanna's sourced goal is a fair
one, given that Hanna worked with Gaeckle (a regional director)
to secure the Kane/McDermott affiliations.[5] However, Hanna

---

[4]     Cardenas points to a November 20th letter from Mr. O'Shea (the
Divisional Vice President), who wrote "I am not sure I am comfortable with
Lou Hanna receiving credit for Kane and McDermott." Cardenas Dep. 107:5-8,
ECF No. 18-3. Furthermore, although McDermott allegedly requested in
September 2017 that he and Kane work only with Joe Gaeckle (the regional
director working with Hanna) going forward, Gaeckle testified that this was
because Kane/McDermott were at a point where they no longer had any questions
for Lincoln and wanted to limit the number of people involved to reduce the
risk of word getting out that they were leaving their current employer. See
Gaeckle Dep. 85:19-87:3, ECF No. 20-4.
[5]     Hanna notes that Exhibit D in Defendant's Motion for Summary Judgment
states that "[i]f a Third-Party Recruiter is utilized during the recruiting
process, the National Recruiter will receive 50% credit for recruited GDC as
sourced business in his/her assigned territory." Def.'s Mot. Summ. J. Ex. D
3, ECF No. 18. However, this statement is a sub-paragraph under the heading
"Trailing twelve Recruited GDC sourced by the National Recruiter." Id. The
next heading is "Trailing twelve Recruited GDC jointly recruited by a

14

emphasized that he is the only one out of any of the national recruiters to not get sourced credit for working with a third-party recruiter, and that he is alone in having his GDC shifted from the allegedly more important sourced GDC to joint GDC.[6] Moreover, Hanna's claim that he should have received sourced credit is further bolstered by the testimony of one of his supervisors (Heather Wills) that she believed Hanna should have received sourced credit for Kane and McDermott. See Wills Dep. 141:24-142:5, 161:7-8, ECF No. 20-4. If Hanna's claim is correct, then granting him the consideration of Kane and McDermott as sourced credit would have placed him at a total of $1,859,321 (all sourced, the most important category) GDC at the time of termination. Compare this to Williams (Hanna's young replacement), who only generated $630,034 in sourced GDC and $377,827 in joint GDC for a total of $1,007,861 at that time.

Lincoln also attempts to dispute that Kane and McDermott were "realistic" prospects. Hanna argues that by the time of his termination, Kane and McDermott had allegedly signed offer letters, formed their own corporation, and committed to new

---

Regional Director of Advisor Acquisition or OSJ and the National Recruiter." Id. This implies that if a National Recruiter sourced their business with the help only of a third-party recruiter, this would still count as sourced credit, but if they sourced their business in conjunction with a regional director AND with the help of a third-party recruiter, it would still count as joint credit.

[6]     Exhibit N in Defendant's Motion for Summary Judgment does support this claim, but it is not clear whether that is because the other recruiters did not work in conjunction with a regional director.

rental space. Whether they were or were not "realistic prospects" or whether Hanna would have received sourced or joint credit for them simply raises a genuine dispute of material fact, best left to the factfinder. Given the factual issues surrounding Hanna's termination, and viewing the facts in the light most favorable to Hanna, Lincoln's Motion for Summary Judgment will be denied with respect to the ADEA disparate treatment claim.

### 2. Pattern or Practice Claim

Hanna also alleges that his termination appears to be part of a pattern or practice of terminating older recruiters. He cites Matthew Phayre, Robert Conrad, James Sorey, and Michael Doss as victims of this pattern. Lincoln's Motion for Summary Judgment will be granted with respect to this pattern/practice claim since Hanna has not pointed to any evidence regarding the performance or productivity of any terminated recruiter except Doss, who had less than $60,000 in affiliated GDC at the time of termination. Therefore, under these circumstances, a reasonable jury could not return a verdict for Hanna on a claim of pattern or practice.

### B.   Count II: ADA violations

### 1. Discrimination Based on Disability

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to . . .

16

discharge of employees." 42 U.S.C. § 12112(a). An individual is disabled if they have "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) [are] regarded as having such an impairment." Id. § 12102(1). Since Hanna did not yet have a disability, his claim is properly analyzed as a "regarded as" claim.

Lincoln argues that to successfully oppose summary judgment in this case, Hanna must establish that he had a non-limiting impairment that Lincoln mistakenly believed limited his major life activities. However, this narrow reading of the law is no longer accurate.[7] Indeed, Congress passed The Americans with Disabilities Act Amendments Act (ADAAA) in 2008 in part to specifically overrule the "mistaken belief" standard. See Wolski v. City of Erie, 900 F. Supp. 2d 553, 565 n.5 (W.D. Pa. 2012) (noting that the ADAAA "made numerous changes to the ADA's definition of 'disability' so as, in part, to overrule the Supreme Court's decision in Sutton, which, it was felt, had unduly narrowed the scope of protection intended to be afforded by the Act" (citation omitted)).

---

[7]    The only relevant case Lincoln cites is Kurylo v. Parkhouse Nursing & Rehab. Ctr., L.P., No. 17-00004, 2017 U.S. Dist. LEXIS 50188, at *11 (E.D. Pa. Apr. 3, 2017). However, it appears that the Court mistakenly cited old case law that was in effect before the ADAAA was enacted, and since that ruling (and even before then), this Court has issued rulings citing the correct standard, as enumerated above. See infra Section IV.B.1.

Now, under the ADAAA, a plaintiff can successfully meet the requirements of a "regarded as" claim if they can establish that they have been "subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment <u>whether or not the impairment limits or is perceived to limit a major life activity</u>." 42 U.S.C. § 12102(3)(A) (emphasis added). "After the 2008 amendments to the ADA definition of disability, all that an ADA plaintiff must show to raise a genuine issue of material fact for the 'regarded as' prong is that a supervisor knew of the purported disability." <u>Cagnetti v. Juniper Vill. at Bensalem Operations</u>, No. 18-5121, 2020 WL 4039027, at *13 (E.D. Pa. July 17, 2020) (quoting <u>Rubano v. Farrell Area Sch. Dist.</u>, 991 F. Supp. 2d 678, 693 (W.D. Pa. 2014)); <u>see also</u> <u>Palish v. K&K RX Servs., L.P.</u>, No. 13-4092, 2014 WL 2692489, at *9 (E.D. Pa. June 13, 2014) (stating that "a plaintiff can establish a genuine issue of fact for 'regarded as' disability by showing that a decisionmaker knew of the impairment").

Hanna has met this burden. Although Cardenas claims ignorance of the specifics of Hanna's health issues, the evidence suggests otherwise. To this point, on June 22, 2017, Hanna wrote to Cardenas, Wills, and Pippett, stating "What are my LFN benefit options in treating the discovery of early stage markers/sustained high PSA for prostate cancer which I discussed

18

with Kelly Pippett approximately a month ago (e.g., Family Leave, Short-Term Disability, or Use of Unused PTO/Vacation days)." See Def.'s Mot. Summ. J. Ex. J 3, ECF No. 18. In response, Cardenas wrote, in part, "we have learned from Kelly Pippett that she explained to you that you are eligible for STD benefits." Id. Ex. P 1. Moreover, Cardenas and Wills testified that at least as of mid-July 2017, they were aware that Hanna was having health issues related to a potential diagnosis of prostate cancer. See Cardenas Dep. 72:7-11, ECF No. 20-4; Wills Dep. 89:13-90:5, ECF No. 20-4. Consequently, Hanna has produced sufficient evidence to raise a genuine dispute of material fact that his supervisors knew of his impairment and that they "regarded [him] as" disabled.

Lincoln also claims that Hanna cannot identify any similarly situated non-disabled employee who was treated more favorably. This argument is unavailing for the same reasons as were rejected in connection with the ADEA claim. As a result, Lincoln's Motion for Summary Judgment will be denied with respect to Hanna's ADA disability discrimination claim.

## 2. Retaliation

To state a prima facie case of ADA retaliation, Hanna must show: (a) engagement in a protected activity; (b) adverse action by Lincoln either after or contemporaneous with the protected activity; and (c) a causal connection between the protected

19

activity and the adverse employment action. <u>Krouse v. Am.</u>
<u>Sterilizer Co.</u>, 126 F.3d 494, 500 (3d Cir. 1997). Lincoln
concedes that Hanna engaged in protected activity by requesting
and taking FMLA leave and that his termination constitutes an
adverse employment action. They argue, however, that any
evidence of causation is lacking because Hanna's performance
issues existed and were documented before he engaged in
protected activity.

The issue of causation here turns on the temporal proximity
between the decision to terminate Hanna, his actual termination,
and his request for FMLA leave.[8] Hanna had already invoked FMLA
leave in August, prior to the decision to terminate him. Hanna
then told Cardenas he would need to take intermittent FMLA leave
on September 5, 2017, just two days before Lincoln claims that
the decision was made to terminate him on September 7.[9] This

---

[8]      Lincoln concedes for purposes of its motion that the invocation of
Hanna's FMLA leave also constituted ADA protected activity. As a result, the
analysis is the same on both claims.
[9]      Hanna was not ultimately terminated until the next month, on October
26. In its position statement to the EEOC, Lincoln claims this was because
they wanted to allow Hanna to take the intermittent leave and allow him
additional time to try and reach his sales goals. This implies that the
decision to terminate him was not made until October 26. However, Lincoln
vehemently asserts in its Motion for Summary Judgment that the decision to
terminate Hanna had already been made as of September 7. Def.'s Mot. Summ. J.
15, ECF No. 18 ("[T]he decision to terminate his employment ***had already been***
***made*** on September 7, 2017."). Cardenas also claimed during his deposition
that the decision was already in place as of September 7 and continuously
referred to Hanna's performance as of that date. <u>See, e.g.</u>, Cardenas Dep.
84:9-12, 92:24-25, ECF No. 20-4. Assuming the deposition testimony is
truthful and accepting Lincoln's assertions in its Motion as correct, this
means that Hanna's termination was locked in and official in the eyes of
Lincoln only two days after Hanna's request for intermittent FMLA leave.

temporal proximity (of only two days between the two events) alone is sufficient to raise an inference of causal connection. Cf. Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997) ("Our cases have established that temporal proximity between the protected activity and the termination is sufficient to establish a causal link." (citing Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) ("[Plaintiff] demonstrated the causal link between the two by the circumstance that the discharge followed rapidly, only two days later, upon [defendant's] receipt of notice of [plaintiff's] EEOC claim."))).

Other Third Circuit cases likewise have found such temporal proximity to be significant. See Moore v. City of Philadelphia, 461 F.3d 331, 351 (3d Cir. 2006) (where "only a short period of time separates an aggrieved employee's protected conduct and an adverse employment decision, such temporal proximity may provide an evidentiary basis from which an inference of retaliation can be drawn" (quoting Fasold v. Justice, 409 F.3d 178, 190 (3d Cir. 2005))); see also Jensen v. Potter, 435 F.3d 444, 450 (3d Cir. 2006) ("Timing alone raises the requisite inference when it is 'unusually suggestive of retaliatory motive,' but even if 'temporal proximity . . . is missing, courts may look to the intervening period for other evidence of retaliatory animus.'" (quoting Krouse, 126 F.3d at 503–04)), overruled in part on

other grounds by <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 126
S. Ct. 2405 (2006).

The temporal proximity described above is enough to raise
an inference of causation here to satisfy the elements for a
prima facie case of ADA retaliation. As a result, Lincoln's
Motion for Summary Judgment will be denied with respect to
Hanna's ADA retaliation claim.

    **C.   Count III: NJLAD violation**

Hanna also asserts claims under the New Jersey Law Against
Discrimination (LAD) for age and disability discrimination.
"Unlike federal discrimination claims brought under the ADEA,
the first LAD element for a prima facie case of age
discrimination is not limited to employees age forty or older."
<u>Wright v. L-3 Commc'ns Corp.</u>, 227 F. Supp. 2d 293, 298 (D.N.J.
2002). Aside from that distinction, "[a]ge discrimination claims
under the ADEA and LAD are governed by the same standards and
allocation of burdens of proof." <u>Lawrence v. Nat'l Westminster
Bank N.J.</u>, 98 F.3d 61, 65 (3d Cir. 1996). Since the laws are
based on the same standards, Lincoln's Motion for Summary
Judgment will be denied with respect to the age discrimination
claim for the same reasons stated above for Hanna's ADEA claim.

In terms of disability discrimination, the LAD is similar
to the ADA in that it also prohibits discrimination based on the
perception of handicap. <u>Gimello v. Agency Rent-A-Car Sys.</u>, 594

A.2d 264, 278 (N.J. Super. Ct. App. Div. 1991); Poff v. Caro, 549 A.2d 900, 903 (N.J. Super. Ct. Law Div. 1987). "The gravamen of a disparate treatment claim [under the LAD] is that employees who are not disabled are treated more favorably than a disabled employee." Seiden v. Marina Assocs., 718 A.2d 1230, 1233 (N.J. Super. Ct. Law Div. 1998). Lincoln again argues that there is no proper comparator here who has been treated more favorably. This assertion is again unavailing based on the reasons discussed above.

Lincoln also argues again that it lacked the necessary knowledge of Hanna's impairment because it did not know the specifics of his health issues, and it cites Illingworth v. Nestle U.S.A., 926 F. Supp. 482, 490 (D.N.J. 1996) (granting summary judgment on LAD disability claim where plaintiff's symptoms were "not sufficiently obvious" to suggest the presence of a disability to his employer, therefore, no knowledge of plaintiff's disability could be attributed under LAD). That case is readily distinguishable because "[a]t no time prior to his termination did Illingworth tell his Nestle [employer] supervisors that he suffered from a medical condition." Id. at 486. As explained above, there is sufficient evidence in this case that Cardenas and Wills were aware of Hanna's impairment prior to his termination. As a result, Lincoln's Motion for Summary Judgment will be denied with respect to the LAD

23

disability discrimination claim for the same reasons stated above for the ADA discrimination claim.

**D.    Count IV: FMLA violation**

To establish a prima facie case of FMLA retaliation, Hanna must show that: 1) he invoked his right to FMLA-qualifying leave; 2) he suffered an adverse employment action; and 3) the adverse employment decision was causally related to his invocation of rights. Lichenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 301–02 (3d Cir. 2012). For the third prong, the Third Circuit applies "a lessened causation standard requiring plaintiffs to show only that the use of FMLA leave was a 'negative factor' in the adverse employment decision." DiFiore v. CSL Behring, LLC, 879 F.3d 71, 78 (3d Cir. 2018).

Lincoln again concedes that Hanna meets the first two prongs and only argues that Hanna cannot demonstrate a causal link between his protected activity and termination. In making its argument, it focuses on Hanna's 2016 performance deficiencies and the fact that the decisions to give Hanna warning letters were made prior to his request for FMLA leave. As explained above, however, there exists a close temporal proximity between the decision to terminate him, his actual termination, and his request for intermittent FMLA leave.

Although the temporal proximity alone is sufficient to
establish an inference of causation,[10] there is further evidence
that suggests a discriminatory animus towards Hanna.
Specifically, on a phone call in September of 2017, Cardenas
allegedly badgered Hanna about FMLA leave for 30-45 minutes,
telling Hanna that he was unreliable and asking 1) if he was
going to take additional FMLA leave, and 2) what Cardenas should
do about it as a manager if Hanna keeps going out on FMLA leave.

Lincoln assumes for purposes of this motion only that those
statements are true, but argues that they are innocuous
questions by a manager trying to ascertain when his subordinate
will and will not be working. These comments, viewed in the
light most favorable to Hanna, raise a genuine dispute of
material fact as to whether the use of FMLA leave was a
"negative factor" in the adverse employment decision. Under

---

[10]    There is other evidence that may also suggest Lincoln's prior hostility
toward its employees' invocation of FMLA rights. For example, Lincoln's 2017
National Recruiter Compensation Plan specifically prohibited the payment of
incentive compensation while the employee was receiving benefits under the
FMLA, whereas employees taking paid time off or parental leave were entitled
to incentive compensation. However, Lincoln later changed its 2018 National
Recruiter Compensation Plan to delete any reference to the FMLA in the
provision regarding payment of compensation upon leave of absence. As
demonstrated in Exhibit 13 of the Plaintiff's Memorandum in Opposition re
Defendant's Motion for Summary Judgment, the new provision deleted all
references to the FMLA and simply states "An employee who takes a leave of
absence for any reason other than Paid Time Off or Parental Leave is not
eligible to receive incentive compensation during the employee's leave
period." Pl.'s Mem. Opp'n re Def.'s Mot. Summ J. Ex. 13, at 5, ECF No. 20.
The Court recognizes that the admissibility of this evidence may be
problematic under Federal Rule of Evidence 403. Consequently, we have not
considered it at this stage of the litigation.

these circumstances, Lincoln's Motion for Summary Judgment will be denied with respect to Hanna's FMLA retaliation claim.

**E.   Count V: Breach of Contract**

At the outset, Hanna and Lincoln disagree as to which state's law applies. Neither party explains why, but Hanna applies New Jersey law and Lincoln applies Pennsylvania law. A federal district court applies the choice of law rules of the state in which it sits. Under Pennsylvania's choice of law rules, a contract is construed according to the law of the state with the "most significant contacts or relationship with the contract." Hammersmith v. TIG Ins. Co., 480 F.3d 220, 228 (3d Cir. 2007) (quoting Wilson v. Transport Ins. Co., 889 A.2d 563, 571 (Pa. Super. Ct. 2005)).

We need not make a decision as to which law applies since New Jersey law does not conflict with Pennsylvania law in regard to breach of contract claims. See, e.g., Lapidoth v. Telcordia Techs., Inc., 22 A.3d 11 (N.J. Super. Ct. App. Div. 2011); McGough v. Broadwing Commc'ns, Inc., 177 F. Supp. 2d 289 (D.N.J. 2001) (applying Pennsylvania law).

The elements of a prima facie case for breach of contract under Pennsylvania law are: (1) the existence of a contract; (2) a breach of a duty imposed by the contract; and (3) damages suffered from the breach. See, e.g., Pennsy Supply, Inc. v. Am. Ash Recycling Corp., 895 A.2d 595, 600 (Pa. Super. Ct. 2006)

26

(quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).

Hanna's breach of contract claim appears to be three-fold. First, he argues he is entitled to trailing commissions for several individuals recruited in 2016 based on the 2016 Compensation Plan. Lincoln argues that in order to be entitled to those commissions, Hanna's 2016 recruits needed to accrue more than $5,000,000 in trailing GDC in 2017, but they accrued less than $1,000,000. In support of its argument, Lincoln claims that it attached the 2016 Compensation Plan as Exhibit H to its Motion for Leave to File a Reply Brief, but it did not explain or elaborate and simply attached the payout schedule under the Plan. Consequently, there is insufficient evidence for Hanna to respond to this contention and for the Court to analyze it.

Second, Hanna argues that he was denied compensation under the 2017 Compensation Plan for seven individuals he allegedly recruited: John Glowka, Patricia Low, Kevin McDermott, John Kane, Gerald Katelhon, Thomas Burke, and Phil Melanson. Lincoln argues that a contract did not exist because the 2017 Compensation Plan explicitly includes a disclaimer that states "This Plan is not a contract." Def.'s Mot. Summ. J. Ex. D 7, ECF No. 18. Hanna appears to argue that although the 2017 Compensation Plan was not a contract, his offer letter created a contractual relationship since the letter did not specifically

reference the 2017 Compensation Plan and he had a reasonable expectation that he would be paid commissions for his efforts. See Lapidoth, 22 A.3d at 18 ("Although a disclaimer may preclude the creation of contractual rights . . . a representation made by the employer directly to the employee may create a contractual right.").

However, since Hanna does not argue that the terms of compensation in the offer letter are contradictory to the ones in the Plan, it is not necessary for the Court to determine whether the offer letter forms the basis of a contract. In any event, the disclaimer in the 2017 Compensation Plan does not "excuse Defendant [Lincoln] from providing [Hanna] compensation for services rendered prior to [Hanna's] termination." See McGough, 177 F. Supp. 2d at 296 (finding that a disclaimer nearly identical to the one at issue here "does not relieve an employer of its contractual obligation to provide the compensation promised in return for an employees services").

Even if the offer letter is not the basis of the contract claim, Hanna may still argue that he is seeking to enforce an implied-in-fact contract, since "a promise to pay the reasonable value of the service is implied where one performs for another, with the other's knowledge, a useful service of a character that is usually charged for, and the latter expresses no dissent or avails himself of the service." Id. at 297 (quoting Martin v.

28

<u>Little, Brown & Co.</u>, 450 A.2d 984, 987 (Pa. Super. Ct. 1981)). For an implied-in-fact contract claim to lie, a party must point to "circumstances under which the party rendering the services would be justified in entertaining a reasonable expectation of being compensated by the party receiving the benefit of those services." <u>Id.</u>

In terms of a breach of duty, with respect to recruiting Glowka, the 2017 Compensation Plan required "specific direct efforts" to receive joint GDC credit. Def.'s Mot. Summ. J. Ex. D 2, ECF No. 18. Although Hanna's deposition testimony was inconsistent with respect to whether specific direct efforts were made, Hanna's Memorandum in Opposition to Lincoln's Motion for Summary Judgment argues that they were made by way of phone conversations with Glowka. Pl.'s Mem. Opp'n re Def.'s Mot. Summ J. ¶ 152, ECF No. 20. This raises a genuine dispute of material fact best left to the factfinder.

In regard to recruiting Low, Lincoln argues they had no duty to pay Hanna any compensation because Low's GDC was less than $100,000, and Lincoln does not pay incentive compensation on recruits with less than $100,000 in GDC. This is disputed and Lincoln does not cite to any such provision in the 2017 Compensation Plan, so there is a genuine dispute of material fact here as well.

With respect to Melanson and Burke, Lincoln argues that
Thomas LaBrie was actually the one to recruit them – not Hanna.
This is contested, given that Exhibit 37 in Plaintiff's
Memorandum in Opposition to Defendant's Motion for Summary
Judgment shows Hanna listed as the opportunity owner for these
individuals. However, Lincoln argues that they had no duty to
pay Hanna for Melanson or Burke for a separate reason that also
applies to Kane, McDermott, and Katelhon – they all registered
with Lincoln shortly after Hanna's termination.

Multiple provisions in the 2017 Compensation Plan are
relevant to this claim. One provision is found under the title
"New Registered Rep Recruited GDC" for both sourced and joint
GDC, and states "The incentive compensation is paid as a single
lump-sum in the quarter following the quarter in which the
newly-recruited registered representative(s) has been approved
by the FINRA for registration with LFN." Def.'s Mot. Summ. J.
Ex. D 3, ECF No. 18. The next is under "Crediting" and states
"Credit is granted once the newly-recruited registered
representative has been approved by the FINRA for registration
with LFN." Id. The final relevant provision is under "Payment of
Incentive Compensation Upon Termination of Employment" and
states:

> Upon termination of employment (whether voluntary or
> involuntary), in order to be eligible to earn
> incentive compensation on products for which an

> Eligible Employee would be otherwise eligible had such
> Eligible Employee remained employed by LFG, the
> following requirement must be met: As of the Eligible
> Employee's last day of active employment, the sale
> must be completed fully (i.e., no additional work must
> be required to close the sale).

Id. at 6.

Lincoln argues that they had no duty to pay Hanna for any recruits that registered after his termination because a sale is only completed fully when a recruit's license is transferred to Lincoln and approved by FINRA. Hanna argues the Plan is ambiguous as to whether the phrase "additional work" includes the ministerial task of FINRA approval, given that Lincoln referred to the specific event of affiliation in two other provisions of the Plan discussing compensation and specifically chose a different phrase when discussing compensation due after termination.

Indeed, Lincoln seemed to agree with Hanna, given that it included Kane and McDermott on Hanna's original compensation statement generated on January 12, 2018, which would have resulted in a payment of $46,362.11. Instead, Lincoln inexplicably generated a new compensation statement, resulting in a payment of $9,489.56. In the light most favorable to the nonmoving party, i.e. Hanna, there is a genuine dispute of material fact as to whether any "additional work" was required to close the sales of the recruits that affiliated after Hanna's

termination and whether Hanna had a reasonable expectation of compensation for them.

Lastly, Hanna argues that to the extent the Plan required him to still be employed at the time of payment, Lincoln violated the implied covenant of good faith and fair dealing by terminating him with the intent of depriving him of the compensation which he would have otherwise received. While typically associated with commercial transactions, the implied covenant that the parties to the contract will act in good faith may also apply here. See Somers v. Somers, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992) ("The duty to perform contractual obligations in good faith does not evaporate merely because the contract is an employment contract, and the employee has been held to be an employee at will."). "The duty of 'good faith' has been defined as '[h]onesty in fact in the conduct or transaction concerned.'" Id. at 136 (quoting 13 Pa.C.S. § 1201).

Here, viewing the facts in the light most favorable to Hanna, there is a genuine dispute of material fact as to whether Lincoln purposely terminated Hanna very shortly before his recruits received FINRA approval in order to avoid paying him. If this is true, Lincoln could be liable for violating the implied covenant of good faith and fair dealing.

Lincoln cites Neal v. Eastern Controls, Inc., No. A-4304-06T1, 2008 WL 706853 (N.J. Super. Ct. App. Div. March 18, 2008),

a case under New Jersey law, as authority that it is not liable for either a breach of contract or for breaching the implied covenant of good faith and fair dealing here, but that case is entirely distinguishable, given that the employee voluntarily resigned to accept employment with another company. Here, Hanna did not resign, but was terminated. Furthermore, the policy at issue was not ambiguous – it stated that "should the present salesman retire or leave for any reason, all payment of salaries and/or commissions will terminate on that date." Id. at *1.

As a result of the foregoing, Lincoln's Motion for Summary Judgment will be denied with respect to these claims.

### F.    Count VI: NJWPL violation

Lastly, Hanna argues that Lincoln failed to pay him commissions and expenses due after his termination in violation of the New Jersey Wage Payment Law (NJWPL). Lincoln's Motion for Summary Judgment will be denied in part with respect to the commissions argument for the same reasons discussed above (i.e., the Plan is arguably ambiguous and Lincoln's claim that "the undisputed facts show that Plaintiff was paid all commissions due" does not explain the inclusion of Kane and McDermott in Hanna's 2018 compensation statement).

However, Lincoln's Motion for Summary Judgment will be granted in part with respect to the expenses claim for two reasons. First, Hanna has not produced any evidence of

33

unreimbursed expenses or requests for reimbursement. Second, expenses are not wages as defined under the NJWPL. See N.J. Stat. Ann. § 34:11-4.1(c) (West 2020). The NJWPL defines wages as "the direct monetary compensation for labor or services rendered by an employee, where the amount is determined on a time, task, piece, or commission basis excluding any form of supplementary incentives and bonuses which are calculated independently of regular wages and paid in addition thereto." Id. Consequently, summary judgment will be granted to Lincoln as to Hanna's claim of entitlement to expenses.

## V.    Conclusion

As a result of the foregoing, Lincoln's Motion for Summary Judgment will be denied in full with respect to Counts II-V, denied in part as to Count I for the individual disparate treatment ADEA claim, and denied in part as to Count VI for the NJWPL claim as it relates to unpaid wages. However, Lincoln's motion will be granted in part with respect to Count I for the ADEA pattern/practice claim and granted in part under Count VI for the NJWPL claim related to unidentified expenses. An order consistent with this memorandum will issue.